**FILED**

FEB 15 2019

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL GENERAL INSURANCE COMPANY, | Case No.: 17cv866-WQH-LL |
| Plaintiff, | **ORDER** |
| v. | |
| GARY ALDERSON, | |
| Defendant. | |

HAYES, Judge:

The matter before the Court is the Motion for Summary Judgment filed by Plaintiff National General Insurance Company. (ECF No. 34).

## I.  PROCEDURAL BACKGROUND

On April 28, 2017, Plaintiff National General Insurance Company (National General) filed a Complaint for Declaratory Relief, seeking a judgment declaring rights and obligations regarding repairs to a "2014 Mercedes Benz Sprinter Van" (the Van) under a personal auto policy (the Policy) issued to Defendant Gary Alderson. (ECF No. 1). The Complaint requests a judgment declaring that under the Policy in this case, National General "owes no obligation to declare the Van a total loss or to pay for loss of use or diminution in value of the Van," and "that [Alderson] has . . . breach[ed] the cooperation obligation under the Policy," which "reliev[es] [National General] from any further obligation under the Policy." *Id.* at 9. National General seeks an award of costs.

On June 23, 2017, Alderson filed an Answer to the Complaint. (ECF No. 6).

On August 18, 2017, Alderson filed a Counter-Complaint, alleging that National General engaged in fraud, misrepresentation, deceit, and breach of contract by marketing its policies to cover "losses and damages" when National General only intended to cover repair costs. (ECF No. 19).

On January 1, 2018, the Court granted National General's Motion to Dismiss the Counter-Complaint without prejudice (ECF No. 29). The Court stated,

> There are no facts alleged in the Counter-Complaint to support a claim for express breach of contract or breach of the covenant of good faith and fair dealing. The allegations that National General elected to pay the repair costs and failed to pay "diminution in value" do not support a claim for improper claims handling given the express provisions of the policy. . . .
> The . . . claims for deceptive business practices, misrepresentation, and fraud . . . allege that National General was not entitled to offer a policy which reserves the right to elect to repair, or a policy which excludes diminution in value from the recovery for "loss." Each of these claims rely solely upon assertions of bad faith and contract provisions against public policy. . . . [T]he facts alleged in support of these claim fail to state a claim for deceptive business practices, misrepresentation, or fraud.

*Id.* at 5–6.

On September 26, 2018, National General filed a Motion for Summary Judgment. (ECF No. 34).

On October 16, 2018, Alderson filed a Response (ECF No. 37) opposing the Motion and raising evidentiary objections, supported by the declarations of Gary Alderson and Montie Day.

On October 22, 2018, National General filed a Reply (ECF No. 40) in support of the Motion, and Objections (ECF No. 41) to the declaration of Montie Day.

On October 24, 2018, Alderson filed a request for oral argument. (ECF No. 43).

On December 4, 2018, Alderson filed citations to the California Insurance Code and a California Supreme Court case. (ECF No. 46).

On January 3, 2019, the Court heard oral argument on the Motion. (ECF No. 47).

## II. STANDARD OF REVIEW

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A material fact is relevant to an element of a claim or defense and whose existence might affect the outcome of the suit. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The materiality of a fact is determined by the substantive law governing the claim or defense. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).

The party moving for summary judgment "bears the burden of establishing the basis for its motion and identifying evidence that demonstrates the absence of a genuine issue of material fact." *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017) (citing *Celotex*, 477 U.S. at 323); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153 (1970). The movant "has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial," and may instead "point out . . . an absence of evidence to support the non-moving party's case." *Sluimer v. Verity, Inc.*, 606 F.3d 584, 586 (9th Cir. 2010) (citing *Celotex*, 477 U.S. at 325). The burden then shifts to the nonmovant to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate. *See Anderson*, 477 U.S. at 256; *see also Horphag Research Ltd. v. Garcia*, 475 F.3d 1029, 1035 (9th Cir. 2007) ("[T]he district court properly shifted the burden to [nonmovant] to set forth evidence raising a disputed issue of material fact after . . . the moving party[] satisfied its initial burden by presenting evidence that demonstrated the absence of any genuine issue of material fact.").

The nonmovant's evidence is to be believed, and all justifiable inferences are to be drawn in its favor. *See Anderson*, 477 U.S. at 255; *see also Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (explaining a nonmovant "defeat[s] summary judgment" with "evidence such that a reasonable juror drawing all inferences in favor of the [nonmovant]

could return a verdict in the [nonmovant's] favor") (internal quotation omitted). Courts "generally may not disregard direct evidence on the basis that it is implausible or incredible." *Burchett v. Bromps*, 466 F. App'x 605, 606 (9th Cir. 2012) (first citing *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987); then citing *McLaughlin v. Liu*, 849 F.2d 1205, 1207–08 (9th Cir. 1988)). The nonmovant must designate which specific facts show a genuine issue for trial. *See Anderson*, 477 U.S. at 256; *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) ("[A] plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations.").

## III. FACTS

On or about January 26, 2016, National General issued Alderson the Policy with respect to the Van. (Def.'s Resp. to Pl.'s Statement of Undisputed Facts 7:12–17, ECF No. 37-1). The Van was valued at $94,093. *Id.* The Policy indicates a $500 deductible for collision coverage, *id.* at 7:14–15, and optional coverage for towing and labor, Ex. 1 to Evid. Compendium, ECF No. 34-6 at 8. Relevant portions of the Policy state:

DEFINITIONS
. . . .
J. "Your covered auto" means:
1. Any vehicle you own shown in the Declarations. . . .

PART D > COVERAGE FOR DAMAGE TO YOUR AUTO
INSURING AGREEMENT
. . . .
B. "Collision" means the upset of "your covered auto" or "non-owned auto" or their impact with another vehicle or object. . . .
PAYMENT OF LOSS
We may pay for loss in money or repair or replace the damaged or stolen property. . . .

PART E > DUTIES AFTER AN ACCIDENT OR LOSS
We have no duty to provide coverage under this policy unless there has been full compliance with the following duties: . . . .
B.  A person seeking any coverage must:

1. Cooperate with us in the investigation, settlement or defense of any claim or suit. . . .

PART F > GENERAL PROVISIONS
. . . .
OUR RIGHT TO RECOVER PAYMENT
A. If we make a payment under this policy and the person to or for whom payment was made has a right to recover damages from another, we shall be subrogated to that right. That person shall do:
1. Whatever is necessary to enable us to exercise our rights; and
2. Nothing after loss to prejudice them.
However, our rights in this paragraph (A.) do not apply under Part D, against any person using "your covered auto" with a reasonable belief that that person is entitled to do so.
B. If we make a payment under this policy and the person to or for whom payment is made recovers damages from another, that person shall:
1. Hold in trust for us the proceeds of the recovery; and
2. Reimburse us to the extent of our payment.
OPTIONAL COVERAGE >
TOWING AND LABOR COSTS COVERAGE . . . .
EXTENDED TRANSPORTATION EXPENSE COVERAGE . . . .

AMENDMENT OF POLICY PROVISIONS - CALIFORNIA
I. DEFINITIONS . . . .
The following definitions are added to the DEFINITIONS section of the policy:
    L. "Actual cash value" means the fair market value of the stolen or damaged property at the time of "loss".
    M. "Diminution in value" means the actual or perceived reduction, if any, in the market value of a vehicle by reason of the fact that it has been damaged and repaired.
    N. "Loss" means sudden, direct and accidental destruction or damage. "Loss" does not include "Diminution in value".
IV. PART D – COVERAGE FOR DAMAGE TO YOUR AUTO
    A. Paragraph A. of the Insuring Agreement is deleted and replaced with the following:
        We will pay for direct and accidental "loss" to "your covered auto" . . . minus any applicable deductible . . . .
    B. Paragraph D. is added to the Insuring Agreement as follows:
        D. Our liability for the cost of repairing "your covered auto" is limited to the amount necessary to perform physical repairs to

your stolen or damaged property. PART D - COVERAGE FOR DAMAGE TO YOUR AUTO does not cover, and we will not pay for, "diminution in value". . . .

D.  The Limit of Liability section of PART D - COVERAGE FOR DAMAGE TO YOUR AUTO is deleted and replaced by the following:

LIMIT OF LIABILITY

Our limit of liability for "total loss" will be the "replacement cost" of the stolen or damaged property less any applicable deductible.

We reserve the right to replace "your new covered auto" or to pay the "total loss" in money. . . .

"Replacement cost" for "your new covered auto" means the cost at the time of "loss", of a new auto of the same model year, make, model and equipment as the one covered under this provision without adjustment for depreciation.

"Total loss", as used in this provision, means "loss" from a single occurrence for which the cost of repair including parts, labor, and sales tax exceeds 80% of the "actual cash value" of "your new covered auto", "Diminution of value" will not be considered when determining whether loss or damage exceeds 80% of the "actual cash value". . . .

VI.  OPTIONAL COVERAGES

The EXTENDED TRANSPORTATION EXPENSES COVERAGE section is deleted and replaced with the following:

. . . .

When there is a "loss" to a "your covered auto" described in the Declarations for which a specific premium charge indicates that Extended Transportation Expenses Coverage is afforded, or to a "non-owned auto," we will pay, without application of deductible, the limit per day to the maximum limit listed in the Declarations for:

1. Transportation expenses incurred by you.

2. Loss of use expense for which you become legally responsible in the event of "loss to a "non-owned auto."

*Id.* at 20–22, 25–20.

Alderson provides his declaration, stating,

I was not provided a sample of any "policy" . . . . I as a lay person without legal training, understood that insurance was to cover "loss" or "damages" to the Vehicle which may result from a collision. . . . At no time while I was purchasing the insurance policy . . . or thereafter up to the time of the accident

6

was I informed or was told that the contract was not for coverage for the loss or damages to my Vehicle, that National General Insurance Company would . . . exclude[] any liability for the payment of the loss or damages [and] only provide[] for repair costs . . . .

(Alderson Decl. ¶¶ 7, 9, ECF 37-2).

On March 8, 2016, Alderson was involved in an accident causing damage to the Van. (Def.'s Resp. to Pl.'s Statement of Undisputed Facts ¶ 2, ECF No. 37-1). Alderson reported the accident to National General, and National General received Alderson's permission to tow the Van to Almaden RV Services Repairs. *Id.* ¶¶ 3–4. Almaden RV Services did not repair the vehicle, and National General received Alderson's permission to tow the Van to Bay Area Body Shop (BABS). *Id.* ¶¶ 4–5. On April 22, 2016, BABS provided National General with a $34,741.39 repair estimate. *Id.* ¶ 7; *see also* Ex. 7 to Evid. Compendium, ECF No. 34-6 at 75–124.

"On May 2, 2016, [National General] opened a subrogation claim file in order to recoup its payments from the liable third party, insured by Liberty Mutual Insurance Company" (Liberty Mutual). (ECF No. 37-1 ¶ 17). On May 2, 2016, a National General specialist reviewed the repair estimate. (Dollinger Decl. ¶ 11, ECF No. 34-5). On May 4, 2016, BABS provided a revised estimate of $35,629.50. *Id.* ¶ 9; *see also* Ex. 10, ECF No. 34-6 at 132–43). The base retail value of the van was approximately $90,750. (ECF No. 37-1 ¶ 8). On May 4, 2016, National General issued checks to BABS in the amount of $35,129.50. *Id.* ¶ 10. National General submitted a subrogation claim to Liberty Mutual for the checks to BABS, which Liberty Mutual paid. *Id.* ¶ 17. The subrogation claim of $35,629.50 corresponded to the check to BABS and a reimbursement for Alderson's $500 deductible. *Id.*

On May 17, 2016, National General received an email from BABS, stating that BABS was "holding [the checks] at the request of the owner. He has asked us not to proceed and is seeking the advice of a lawyer on the bodily injury and diminished value question." (Ex. 12 to Evid. Compendium, ECF No. 34-7 at 11). Alderson's declaration states,

[BABS] was known as a shop controlled and/or utilized by National General Insurance Company. . . . I was concerned . . . whether the Vehicle could be repair[ed] to its pre-accident condition as to both pre-accident value and more importantly the safety . . . . I contacted . . . two separate appraisal companies . . . and did obtain reports both of which supported the fact that the vehicle could not be restored to its pre-accident condition and value which I understood there would be a loss of value notwithstanding attempts to repair the Vehicle.

(Alderson Decl. ¶¶ 5, 11–12, ECF No. 37-2).

On June 14, 2016, Alderson sent National General a letter contesting subrogation rights, and National General "returned to Liberty Mutual the collision portion of the monies . . . received." (Def.'s Resp. to Pl.'s Statement of Undisputed Facts ¶ 18, ECF No. 37-1). On June 21, 2016, Jessica Henderson of National General sent Alderson an email:

[Y]our policy allows NGIC the right to pursue subrogation for payments made. NGIC has made you whole for the repairs to your vehicle, reimbursement of your deductible, and personal effects up to the amount of your policy limits. The diminished value, loss of use, and personal property above and beyond what your policy with NGIC allows does have to be addressed with Liberty Mutual directly. The "make whole" language you are referencing does not require NGIC to reimburse you for those items from the "First Fruits" of our recovery.

(Ex. B. to Alderson Decl., ECF No. 37-2 at 9).

On July 13, 2016, Alderson's counsel emailed Alderson stating, "[B]e sure to let the body shop know that they are not to start the repairs . . . . Your vehicle is a 'total loss'." (Ex. 53, ECF No. 34-9 at 24).

On October 6, 2016, National General "conducted an on-site inspection of the Van to confirm the scope of repairs provided by BABS." (Brockmann Decl. ¶ 21, ECF No. 34-5). On October 24, 2016, National General obtained a valuation report for the Van stating a fair market value of $88,103. *Id.* ¶ 23; *see also* Ex. 23, ECF No. 34-9 at 114–22.

On November 7, 2016, National General's counsel wrote Alderson's counsel, stating that the Policy does not cover diminution in value, and offering to "assume all storage fees and related amounts charged by BABS for storing the vehicle" and "pay Mr. Alderson

$87,603." (Ex. 24, ECF No. 34-7 at 124–28). On November 10, 2016, Alderson's counsel responded: "Needless to say, the purported offer which only benefits National General Insurance Company and totally disregards the interest of Mr. Alderson is not accepted." (Ex. 25, ECF No. 34-7 at 130–35). On November 30, 2016, National General's counsel responded, providing a copy of the October 24, 2016 valuation and stating:

> The pre-accident fair market value of the insured vehicle exceeds $85,000. In order to be a total loss under the contract, the cost of repairs must exceed $68,000. The repair estimate obtained from BABS totaled just under $36,000, a difference of $32,000. . . . Under these facts, there is no reasonable basis to conclude that the insured vehicle should be deemed a "total loss" under the terms of the National General policy. At your request, National General conducted an additional inspection of the vehicle and concluded the repair estimate previously provided is accurate. . . . The National General policy includes an appraisal clause for resolving disputes regarding value and the amount of loss. National General would agree to submit this dispute to an appraisal. If you are in agreement, please advise who Mr. Alderson selects as his appraiser.

(Ex. 26, ECF No. 34-8 at 7–10).

On December 10, 2016, Alderson's counsel responded:

> [Y]ou cite some specific language from the policy . . . that "diminished value" is not a factor. . . . [T]his attempt to circumvent the California law by the express terms is void . . . . If you wish to explain some legal authority which would authorize National General Insurance to issue the policy which covers only repair costs (not actual loss or damages), I will be more than please[d] to consider such.

(Ex. 27, ECF No. 34-8 at 35–36).

On February 16, 2017, National General's counsel requested that Alderson's counsel confirm that Mr. Alderson rejected the November 7, 2016 settlement offer of $87,603. (Ex. 31, ECF No. 34-8 at 35–36).

On February 23, 2017, Alderson's counsel responded: "In exchange for payment of $100,000.00 . . . we can resolve the claim with respect to 'property damages' with respect to the vehicle and Mr. Alderson will also waive any claims for 'loss of use' as to National General Insurance." (Ex. 32, ECF No. 34-8 at 48–50).

9

On March 8, 2017, National General's counsel responded:

National General Insurance Company agrees to settle your client's collision claim for [$100,000] and agrees to be responsible for all storage charges billed by [BABS]. In exchange, Mr. Alderson agrees to 1) release National General from all claims relating to the property damage sustained in the accident, including any breach of contract or "bad faith," 2) sign over title to the vehicle to National General, and 3) acknowledge that National General is not waiving its right to subrogate, should Mr. Alderson be made whole for his property damage loss from amounts he recovers in the liability action he is pursuing.

(Ex. 34, ECF No. 34-8 at 55). On March 16, 2017, Alderson's counsel responded:

I was hoping you were serious about settlement of the case but this offer is not even realistic . . . . The offer is rejected . . . . National General Insurance, in this case, has no subrogation rights for a number of reasons. . . . The other alternative, with respect to property damages and the property claim (including loss of use), is that National General Insurance pay the $100,000.00 as set forth above, with the additional $140,000.00 for the past loss of use (total $240,000.00), and then National General Insurance can proceed with subrogation with respect to property damages against the third party subject only to the restrictions that Mr. Alderson be "made whole" for his personal injury and medical expenses.

(Ex. 35, ECF No. 34-8 at 61–62).

On April 6, 2017, National General's counsel responded:

[I]t appears there is some confusion . . . . First, National General is accepting the demand you made on behalf of your client to pay $100,000 . . . . Second, National General is not attempting to assert a claim for subrogation unless and until Mr. Alderson is made whole. . . .
National General once again . . . offers $100,000 . . . in exchange for 1) a release of National General from all claims relating to the property damages sustained in the accident, including any breach of contract or "bad faith", 2) title to the vehicle, and 3) an acknowledgment that National General is not waiving its right to subrogate after Mr. Alderson is made whole for his property damages arising from the accident from amounts he recovers in the liability action he is pursuing.

(Ex. 36, ECF No. 34-8 at 64–66). On April 27, 2017, National General's counsel wrote Alderson's counsel stating,

We have made several attempts to resolve this matter and to date we have not heard from you regarding our last offer. . . . In early May 2016, National General issued two checks to the body shop and your client totaling $35,129.50. . . . [that] were never cashed. . . .

We now enclose a check . . . for $35,129.50. This represents the undisputed amount owed under the policy. While we understand that . . . the actual repair cost could be higher, at this point there is no way to determine if that is true or not since your client has refused to authorize the body shop to begin the repairs. If your client chooses to proceed with the vehicle repairs . . . [or] if you wish to resume settlement negotiations, please contact me.

(Ex. 37, ECF No. 34-8 at 72).

On August 2, 2017, National General's counsel emailed Alderson's counsel, stating, "I understand from our conversation today that your client undertook an inspection of the vehicle approximately two weeks ago. Neither I, nor NGIC received any notice of that inspection and, to date, we have not seen a copy of that report. Please send me a copy of that report as soon as possible for our review." (Ex. 41, ECF No. 34-8 at 84). Alderson's declaration states, "I independently . . . obtain[ed] a frame and actual inspection of the vehicle" from Phil Waters of "Your Mechanic RV, Trailer and Parts Center." *Id.* ¶ 16. Alderson's declaration states that the "report confirm[ed] that the vehicle cannot be practically repaired and should not be repaired (as I had suspected)." *Id.* Alderson provides photographs and the June 24, 2017 report, which states in part, "By law you can[]not pull or straighten high strength steel frames. . . . Any attempt to try and repair this vehicle would create mechanical problems, suspension problems and would leave a repair shop open to major liability." Ex. C to Alderson Decl., ECF 37-2 at 10; *see also* Ex. 42, ECF No. 34-8 at 86–93.

Between August 29, 2017 and October 25, 2017, National General's counsel and Alderson's counsel exchanged emails, in which National General requested permission to pull the frame on the Van to determine if there was a total loss and did not receive permission. (Exs. 43–44, ECF No. 34-8 at 95–110).

"On February 12, 2018, National General purchased the Van at [a] lien sale for $24,830. . . . [I]n May 2018, National General moved the Van to . . . Martinez, California.

The Van has been wrapped to protect it." (Brockmann Decl. ¶¶ 28–29, ECF No. 34-5). Alderson has not allowed National General to perform repairs to the Van at any time since May 2016. Def.'s Resp. to Pl.'s Statement of Undisputed Facts ¶ 15, ECF No. 37-1; *see also* Ex. 53, Alderson Dep., ECF 34-9 at 22.

Alderson's declaration states that he is seventy-four years old and suffers from multiple sclerosis. (Alderson Decl. ¶¶ 1, 3, ECF 37-2). Alderson's declaration states that before the accident he "lived a normal life," "was able to walk with a walker," golf, travel, and "care for [him]self" with limited pain and relative functionality. *Id.* ¶ 3. Alderson's declaration states that he financed the purchase of the Van and "at the time of the accident [he] owed the Bank of America approximately $60,000." *Id.* ¶ 7. Alderson's declaration states that he lost use of the Van following the lien sale, that he "still owe[s] the balance of the storage charges which is approximately $56,860.00," and that he is "still liable for the financing lien with the Bank of America." *Id.* ¶ 17. Alderson's declaration states that as a result of personal injuries from the accident,

> I have lost hearing to the extent I am required to utilize hearing aids, have had such pain in my back that I have some nerves in my back severed which must be redone ever five months to five years as needed for the rest of my life. I have not been able to walk. Needless to say, I cannot travel, drive, play golf, or do any of my normal activities and even have to have my wife help me when I go to the bathroom (pulling my pants up).

*Id.* ¶ 18.

Alderson provides a declaration by his counsel, Montie Day, stating:

> [T]he automobile insurance industry would repair vehicles without considerations of either the financial interest of the insured or even the increased risk of injury and death resultant f[ro]m malfunctions of these substantially damaged and repaired vehicles, between 300 to 1,000 citizens were killed in California each year, with many other citizens injured. . . .
> [California] Jury Instruction 3903J . . . was revised to make it clear that the insureds and claimants were entitled to both repair costs and diminished value as the measure of "loss" represented by the property damage, limited only to the pre-accident value of the vehicle. . . .

National General Insurance Company's website which advertises and promotes the product as "Insurance" . . . at no place . . . . advise[s] that it will not pay "loss" for the reduction of value of the insured Vehicles . . . .

(Day Decl. ¶¶ 5, 7, 9, 14, ECF No. 37-3).

## IV. FIRST CLAIM FOR DECLARATORY RELIEF

National General's first claim for declaratory relief states, "NGIC contends the vehicle is not a total loss and can and should be repaired and that NGIC owes no obligation to pay for loss of use or diminution in value pursuant to the terms of the NGIC policy." (ECF No. 1 ¶ 17). National General requests that the Court issue a judgment "[d]eclaring that NGIC properly offered to pay for the physical repairs to the Van, less the applicable deductible, and that NGIC owes no obligation to declare the Van a total loss or to pay for loss of use or diminution in value of the Van." *Id.* at 9.

Alderson asserts six affirmative defenses to National General's claims: (1) that National General engaged in deceptive business practices in violation of Business and Professions Code §§ 17000 and 17500 et. seq., as defined in Insurance Code § 790.03; (2) that the Policy is void as a matter of law for exclusion of diminution of value or loss of use damages, and breaches the implied covenant of good faith and fair dealing; (3) that National General breached the Policy in not declaring the Van a total loss; (4) that National General has subrogation rights limited by the extent Alderson is made whole and the covenant of good faith and fair dealing; (5) that National General has unclean hands for bad faith circumvention of Insurance Code § 790.03 and engaging in deceptive business practices as defined in Business and Professions Code § 17200 et. seq.; and (6) that the Fifth Amendment precludes National General from deciding whether the Van was repaired or salvaged. (ECF No. 6 at 7–11).

### A. Contentions

National General contends that as a matter of law, the Policy provisions and undisputed facts entitle it to a judgment stating that National General had the right to elect to repair the Van and owed no obligation to pay Alderson for diminution in value or loss

13

of use. (ECF No. 34-1 at 17). National General asserts that the Policy language is clear and explicit. National General contends that limiting the risks it assumes under the Policy—to actual costs of repairing physical damage, excluding diminution in value or loss of use—is not against public policy and does not violate the covenant of good faith. National General asserts that choosing to repair the Van and declining to pay for diminution in value or loss of use did not breach the Policy. National General contends that Alderson's affirmative defenses are not a barrier to summary judgment in its favor because the undisputed facts show that Alderson cannot establish any of his affirmative defenses.

Alderson asserts that the issue in this case is whether "the purported policy . . . sold as 'Insurance' . . . is actually "Insurance" and/or whether such contract by National General Insurance Company represents a fraud on the public . . . or under the other option, a contract for the repair of vehicles damaged by accidents, without the payment of 'loss' (non-insurance)." (ECF No. 37 at 5). Alderson contends that under California law, "'[i]nsurance' is not a contract merely to 'repair' or to 'mitigate' and reduce the amount of the loss, damage or liability." *Id.* at 7. Alderson asserts that express policy provisions that "indemnify the insured for the 'loss'" are ambiguous because they conflict with provisions that exclude diminution in value from the definition of "loss." *Id.* at 10. Alderson contends that the implied duty of good faith and fair dealing requires an insurer to give "at least as much consideration to the interests of the insured as it gives to its own interests," and to fully and promptly investigate all possible bases of claims before denying them. *Id.* at 12–13. Alderson asserts that "[t]here is no evidence that the vehicle can be repaired to its pre-accident condition with respect to safety[, ]performance, or value, or whether such is practical." Alderson asserts that the evidence shows that the Van "cannot be repaired" and that attempting repairs would risk liability. *Id.* at 12. Alderson asserts that if National General's position is correct,

> Gary Alderson will be a victim without compensation for his . . . property
> damages, the loss of use of his vehicle . . . his liability to pay for the vehicle,
> loss of the "premiums" he paid National General Insurance Company for more
> than two years while the vehicle could not be repaired, and likely will never

be able to seek compensation from the at fault driver due to "subrogation" by National General Insurances Company which will defeat his chance of ever being made whole. . . .

*Id.* at 20.

## B. Substantive Law

California law governs in this diversity action. *See Hyundai Motor Am. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 600 F.3d 1092, 1097 (9th Cir. 2010); *see also Erie Ry. Co. v. Tompkins*, 304 U.S. 64, 71–80 (1938). Absent "convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts." *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001) (quotation omitted).

"Under California law, '[t]he fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting.'" *Skilstaf, Inc., v. CVS Caremark Corp.*, 669 F.3d 1005, 1014–15 (9th Cir. 2012) (citation omitted). "The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 963 (9th Cir. 2010) (quoting Cal. Civ. Code § 1638). "When a contract is reduced to writing, the parties' intention is determined from the writing alone, if possible." *Cedars-Sinai Med. Ctr. v. Shewry*, 41 Cal. Rptr. 3d 48, 60 (Ct. App. 2006) (citation omitted).

To interpret a contract, courts follow a two-step analysis:

> First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence, the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step – interpreting the contract.

*F.B.T.*, 621 F.3d at 963 (quoting *Winet v. Price*, 6 Cal. Rptr. 2d 554, 557 (Ct. App. 1992)). "The initial question whether a contract is ambiguous is . . . one of law." *Niederer v. Ferreira*, 234 Cal. Rptr. 779, 787 (Ct. App. 1987). "If, after considering the language of the contract and any admissible extrinsic evidence, the meaning of the contract is

15

unambiguous a court may properly interpret it on a motion for summary judgment." *Miller v. Glenn Miller Prods.*, 454 F.3d 975, 990 (9th Cir. 2006) (per curiam).

"Interpretation of an insurance policy is a question of law." *Baldwin v. AAA N. Cal., Nev. & Utah*, 204 Cal Rptr. 3d 433, 437 (Ct. App. 2016); *see also Bank of the W. v. Superior Court*, 833 P.2d 545, 551–52 (Cal. 1992) ("While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply."). "It is a well-established principle that an insurer has the right to limit policy coverage in plain and understandable language." *Carson v. Mercury Ins. Co.*, 148 Cal. Rptr. 3d 518, 532 (Ct. App. 2012). In *Carson*, the court affirmed summary judgment in favor of Mercury Insurance stating,

> Mercury's failure to take into account the vehicle's depreciation in value when opting to repair the vehicle *cannot be deemed against public policy or the covenant of good faith.* As stated, the insurer has the right to limit the nature of the risk it undertakes to assume. It limited the policy's coverage in plain and understandable language to exclude payments for diminution in value. We cannot say this exclusion is against the public good because Carson did not pay Mercury premiums for this added form of coverage.

148 Cal Rptr. 3d at 533 (emphasis added); *see also Baldwin*, 204 Cal Rptr. 3d at 442 (rejecting the argument that excluding coverage for decline in future resale value was void for violating public policy). "To hold [the insurer] liable for the automobile's diminution in value would . . . render meaningless its clear right to elect to repair rather than to pay the actual cash value of the vehicle at the time of the loss." *Ray v. Farmer Ins. Exch.*, 246 Cal. Rptr. 593, 596 (Ct. App. 1988).

"[U]nder California law, all contracts have an implied covenant of good faith and fair dealing." *In re Vylene Enters., Inc. v. Naugles, Inc.*, 90 F.3d 1472, 1477 (9th Cir. 1996) (citing *Harm v. Frasher*, 5 Cal. Rptr. 367, 374 (Ct. App. 1960)). The covenant "exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made.*" *Guz v. Bechtel Nat'l Inc.*, 8 P.3d 1089, 1110 (Cal. 2000). The covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement." *Id.*

"The performance of an act specifically authorized by the policy cannot, as a matter of law, constitute bad faith." *Hibbs v. Allstate Ins. Co.*, 123 Cal. Rptr. 3d 80, 89 (Ct. App. 2011) (citation omitted).

Excluding coverage for diminution in value does not breach the implied covenant of good faith and fair dealing. *Carson*, 148 Cal. Rptr. 3d at 536 ("This argument is nonsensical. . . . We found no authority, and Carson cites to none, holding the covenant of good faith is triggered before the agreement is formed and also imposes a duty to *draft* an agreement in a particular way."). The fact that the insured's "financial interests [a]re negatively affected after [a] repair [i]s not a breach of the covenant [if] stigma damages were not a contracted benefit of the bargain." *Id.* at 535.

"[P]ublic policy concerns (as well as the covenant of good faith and fair dealing) would come into play if [the insurer] refuse[d] to acknowledge the vehicle was nonrepairable but nevertheless proceeded with a purely cosmetic restoration." *Id.* at 533. An insurer may breach the implied covenant of good faith and fair dealing if the insurer has "discretion to repair rather than pay the market value of [the] vehicle, and after having decided to repair it . . . there was evidence the car actually could not have been repaired to its preaccident safe condition." *Id.* at 530; *see also Hibbs*, 123 Cal. Rptr. 3d at 89 ("The Hibbs argue Allstate acted in bad faith when it authorized the repairs. But they cite no authority that authorizing the repairs constitutes bad faith. . . . Nor can they show that the van was not in fact, repaired to a safe condition. It is undisputed that Allstate was willing to guarantee the repairs."); *Copelan v. Infinity Ins. Co.*, 192 F. Supp. 3d 1063, 1065 (C.D. Cal. 2016) ("Copelan's central theory of liability . . . is that Liberty should have considered diminished value in electing to repair the vehicle. However, this argument was specifically rejected in *Carson*."), *rev'd in part on other grounds*, 728 F. App'x 724 (9th Cir. 2018) ("Under its policy with Copelan, Liberty had discretion to repair the Mercedes. Plaintiffs have not alleged that Liberty's repairs left the car 'unsafe' . . . or otherwise failed to return it to its 'normal running condition.' . . . As a result, Liberty's 'election to repair is

conclusive,' regardless of any diminution in value.") (first quoting *Baldwin*, 204 Cal. Rptr.
3d at 442, then quoting *Ray*, 246 Cal. Rptr at 595).

An insurer may breach the implied covenant of good faith and fair dealing by
pursuing subrogation before the insured is made whole by the liable third party, particularly
if the insurer's subrogation claim was for repairs not authorized by the insured.  *See*
*Carson*, 148 Cal. Rptr. 3d at 534 ("California courts recognize a made-whole rule when—
typically due to underinsurance—the tortfeasor could not pay his or her entire debt to the
insured[.] The general rule is that an insurer that pays a portion of the debt owed to the
insured is not entitled to [reimbursement] for that portion of the debt until the debt is fully
discharged."); *Hibbs*, 123 Cal. Rptr. 3d at 82 ("The insurer may be liable in bad faith . . .
when it pays for repairs not authorized by the insured, and then recovers from the tortfeasor
in subrogation because the subrogation action may be prejudicial to the insured's direct
action against the tortfeasor.").

### C. Discussion

National General has the burden to show, first, that no reasonable interpretation of
the terms of coverage in the Policy requires National General to pay for diminution in value
or loss of use, or does not reserve to National General the right to elect repair.  Second,
National General has the burden to show that it properly offered to pay for physical repairs
for the Van and declined to declare a total loss or pay for diminution in value.  National
General "has no burden to negate or disprove" Alderson's affirmative defenses, and may
prevail on summary judgment by "point[ing] out . . . an absence of evidence to support"
Alderson's claims. *See Sluimer*, 606 F.3d at 586.

### 1. Policy Coverage

The Policy states: "We may pay for loss in money or repair or replace the damaged
or stolen property"; "Our liability for the cost of repairing 'your covered auto' is limited to
the amount necessary to perform physical repairs to your stolen or damaged property.
PART D - COVERAGE FOR DAMAGE TO YOUR AUTO does not cover, and we will
not pay for, 'diminution in value'"—"mean[ing] . . . reduction . . . in the market value of a

vehicle by reason of the fact that it has been damaged and repaired." The Policy states: "Our limit of liability for 'total loss'" when "the cost of repair . . . exceeds 80% of the 'actual cash value,'"—"mean[ing] the fair market value of the . . . damaged property at the time of 'loss'"—"will be the 'replacement cost' of the . . . damaged property less any applicable deductible."; "'Loss' means sudden, direct and accidental destruction or damage. 'Loss' does not include 'Diminution in value'."; "'Diminution of value' will not be considered when determining whether loss or damage exceeds 80% of the 'actual cash value'. . . ." The Policy indicates optional coverage is available for "Towing and Labor," as well as "Extended Transportation Expense Coverage" that provides for payment of "loss of use expense." The declarations page shows that Alderson paid for Towing and Labor coverage and there is "no specific premium charge" indicating that Alderson purchased Extended Transportation Expense Coverage for loss of use.

The language of the Policy is clear and unambiguous. The Policy does not cover diminution in value or loss of use. The Policy gives National General the choice to "pay for loss in money," or pay for repairs, or replace a covered vehicle. The Policy generally limits National General's liability to the cost of physical repairs. The Policy specifically limits National General's liability to the replacement cost, when there is a total loss, as defined by the Policy. The liability limits correspond to the amount of coverage owed by National General, not the form of coverage. National General retains the right to choose the form of the coverage—payment, repair, or replacement—up to the amount of the applicable liability limit. National General has satisfied its burden to show that the terms of the Policy do not obligate National General to cover diminution in value or loss of use, and reserves to National General the right to elect repair. The burden shifts to Alderson "to set forth evidence raising a disputed issue of material fact" as to the terms of coverage in the Policy. *See Horphag*, 475 F.3d at 1035.

The statements in Alderson's declaration regarding the Policy's coverage—that he assumed the Policy would cover diminution in value or loss of use, that he did not know and was not told such damages were excluded from the Policy, and that he did not obtain

a copy of the Policy—do not raise a genuine issue of material fact as to the express terms of the Policy. *See Norcia v. Samsung Telecommunications Am., LLC*, 845 F.3d 1279, 1284 (9th Cir. 2017) ("A party who is bound by a contract is bound by all its terms, whether or not the party was aware of them. 'A party cannot avoid the terms of a contract on the ground that he or she failed to read it before signing.'") (quoting *Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 107 Cal. Rptr. 2d 645, 651 (Ct. App. 2001)). Alderson's assertions that the terms of the Policy are ambiguous and contrary to California public policy and contract principles are not supporting by any existing law. *See Carson*, 148 Cal Rptr. 3d at 533, 536 ("It is a well-established principle that an insurer has the right to limit policy coverage in plain and understandable language. . . . We cannot say this exclusion is against the public good because Carson did not pay Mercury premiums for this added form of coverage. . . . We found no authority, and Carson cites to none, holding the covenant of good faith is triggered before the agreement is formed and also imposes a duty to *draft* an agreement in a particular way."); *Baldwin*, 204 Cal Rptr. 3d at 442 (rejecting the argument that excluding coverage for decline in future resale value was void for violating public policy); *Ray*, 246 Cal. Rptr. at 596 ("We will not rewrite an otherwise unambiguous limitation of collision coverage to provide for a risk not bargained for.").[1] Alderson fails to raise a genuine issue of material fact regarding the terms of coverage in the Policy.

---

[1] California courts have rejected defense counsel's argument that excluding diminution in value violates California law. In three of those cases, the argument was raised by Montie Day, defense counsel in this case. *See Carson*, 148 Cal. Rptr. 3d at 521; *Baldwin*, 204 Cal. Rptr. 3d at 436; *Copelan*, 192 F. Supp. 3d at 1065, *rev'd in part on other grounds*, 728 F. App'x 724 (9th Cir. 2018). Day, on Alderson's behalf, rejected National General's offer to pay $100,000 plus the storage charges that Alderson's declaration states are still owed, and continued to advance the diminution in value argument. Alderson is in his seventies, suffering from multiple sclerosis, unable to walk, unable to hear without hearing aids, and unable to use the bathroom without assistance. *See First Interstate Bank of Ariz. v. Murphy, Weir & Butler*, 210 F.3d 983, 986 (9th Cir. 2000) ("[T]he attorney owes a basic obligation to provide sound advice in furtherance of a client's best interests.").

## 2. National General's Compliance with the Policy

In this case, the evidence in the record shows that National General declined to pay for diminution in value or loss of use. The evidence shows that the estimates of the cost to repair the Van were $34,741.39 and $35,629.50. The evidence shows that the fair market value of the Van was ascertained based on an estimated base retail value of $90,750 and a valuation of $88,103. The Policy specifically states that National General may choose to pay for repairs rather than payment of money or replacement of the vehicle. The evidence shows that the repair estimates in this case did not qualify as a total loss under the terms of the Policy. The Policy specifically states that diminution in value is not considered in the total loss calculation. National General complied with the Policy when it excluded diminution in value from the total loss calculation. National General complied with the Policy when it offered to pay for repairs rather than pay money or replace the Van. National General complied with the Policy when it declined to pay for diminution in value or loss of use.

The evidence shows that the Van remains in its unrepaired state. There is no evidence to show that National General "refused to acknowledge the vehicle was nonrepairable but nevertheless proceeded with a purely cosmetic restoration" in breach of the implied covenant of good faith and fair dealing. *See Carson*, 148 Cal. Rptr. 3d at 533; *see also Baldwin*, 204 Cal. Rptr. 3d at 442 ("Although Appellant does allege that AAA refused to acknowledge his pickup was nonrepairable, he does *not* contend that the resulting repairs were purely cosmetic or that the pickup returned to him actually was unsafe."). National General did not breach the implied covenant of good faith and fair dealing by declining to pay for diminution in value or loss of use damages, or by declining to consider such damages or Alderson's financial interests when choosing to repair the vehicle. *See Hibbs*, 123 Cal. Rptr. 3d at 89 ("The performance of an act specifically authorized by the policy cannot, as a matter of law, constitute bad faith."); *Carson*, 148 Cal. Rptr. 3d at 533, 535 ("Mercury's failure to take into account the vehicle's depreciation in value when opting to repair the vehicle cannot be deemed against . . . the covenant of

good faith. . . . That Carson's financial interests were negatively affected after the repair was not a breach of the covenant because stigma damages were not a contracted benefit of the bargain. Mercury did all that it promised to do.").

National General has carried the burden to show that offering to pay to repair the Van rather than declare the Van a total loss, and not covering diminution in value, was proper under the express terms of the Policy and the implied covenant of good faith and fair dealing. The burden shifts to Alderson to "set forth evidence raising a disputed issue of material fact." *See Horphag*, 475 F.3d at 1035.

Alderson's evidence shows that Alderson did not authorize any repairs. The statements in Alderson's and Day's declarations regarding bad faith and the advisability of repairing the Van do not raise a genuine issue of material fact—the evidence shows that no repairs occurred, let alone "purely cosmetic" repairs, or repairs that failed to return the Van "to its preaccident safe condition." *See Carson*, 148 Cal. Rptr. 3d at 530, 533.

The statements in Alderson's declaration regarding National General's assertions of subrogation rights do not raise a material issue of fact—the evidence shows that the funds were returned to Liberty Mutual, leaving Alderson's third party recovery prospects unchanged. National General did not prejudice Alderson's ability to recover from the liable third party in breach of the implied covenant of good faith and fair dealing. *See Hibbs*, 123 Cal. Rptr. 3d at 90 (identifying a triable issue of fact as to breach of good faith when subrogation payments received by the insurer would reduce the recovery available to the insured in a lawsuit against the liable third party); *see also Copelan*, 728 F. App'x at 726 ("Plaintiffs have failed to allege that Liberty's pursuit of its subrogation claims prevented Copelan . . . from recovering from the[] tortfeasors.") (citing *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) ("Plaintiff must show that he was foreclosed from recovering from the tortfeasor because of Defendant's act of seeking and obtaining reimbursement.")).

The statements in Day's declaration regarding the revised California jury instruction does not raise a genuine issue of material fact—there is no evidence showing that National

General acted in bad faith under the Policy, and the Court need not consider the jury instruction. *See Baldwin*, 204 Cal. Rptr. 3d at 445 n.6 ("As Appellant cannot state a cause of action against AAA for bad faith under either insurance contract, there is no need to consider the appropriate measure of property damages in tort. Accordingly, we deny as irrelevant Appellant's . . . request that we take judicial notice of (1) the decision of the Judicial Council of California, at its December 2015, to amend California Civil Jury Instruction Number 3903J, and (2) the amended instruction."). Alderson fails to raise a genuine issue of material fact regarding the propriety of National General offering to pay to repair the Van rather than declare it a total loss, and not covering diminution in value, under the express terms of the Policy and the implied covenant of good faith and fair dealing.

### 3. Affirmative Defenses

The evidence in the record is inadequate to support claims for deceptive business practices, breach of the express terms of the Policy, breach of the implied covenant of good faith and fair dealing, unclean hands, or Fifth Amendment violation. National General has met its burden to point out an absence of evidence supporting Alderson's affirmative defenses. The burden shifts to Alderson to put forth admissible evidence beyond the pleadings to show a genuine dispute of material fact related to his affirmative defenses. *See Exp.-Imp. Bank of the U.S. v. United Cal. Disc. Corp.*, 738 F. Supp. 2d 1047, 1059 (C.D. Cal. 2010) ("[P]laintiff has met its burden . . . . It is then defendant's obligation to identify specific facts demonstrating that there is a genuine issue of material fact on the issue. Defendant must do more than simply rely on the affirmative defenses pled in its answer."), *aff'd*, 484 F. App'x 91 (9th Cir. 2012).

Alderson's Response in opposition to summary judgment does not address the affirmative defenses raised in his Answer. However, the Court has reviewed the evidence that appears to support the affirmative defenses and concludes that the evidence does not raise a genuine issue of material fact. *See Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006) (denying summary judgment in favor of defendants who

failed to produce evidence in support of their affirmative defenses); *see also Aguilar v. Zep Inc.*, No. 13-CV-00563-WHO, 2014 WL 4245988, at *19 (N.D. Cal. Aug. 27, 2014) ("Zep's opposition does not address unjust enrichment and therefore Zep does not sustain its burden of proof at summary judgment with respect to this affirmative defense.").

National General is entitled to a judgment stating that under the terms of the Policy, National General properly offered to pay for the physical repairs to the Van, less the applicable deductible, and that NGIC owed no obligation to declare the Van a total loss or to pay for loss of use or diminution in value of the Van.

## V. SECOND CLAIM FOR DECLARATORY RELIEF

National General's second claim for relief states that "NGIC contends defendant has not cooperated with NGIC in the adjustment of his collision claim and refused and continues to refuse to authorize the body shop to repair his vehicle, resulting in continuing and unnecessary storage charges." (ECF No. 1 ¶ 20). National General seeks a judgment "[d]eclaring that defendant has failed to cooperate in the adjustment of his collision claim, breaching the cooperation obligation under the Policy and relieving NGIC from any further obligation under the Policy." *Id.* at 9.

National General contends that as a matter of law, the undisputed facts entitle it to a judgment stating that Alderson's conduct in this matter relieves National General from any further Policy obligations related to the March 8, 2016 accident. National General asserts that it fulfilled its Policy obligations through its efforts to repair the Van. Alderson's Response in opposition to summary judgment does not address excuse of National General's performance obligations based on Alderson's refusal to authorize repairs.

If an insurance policy "clearly and unequivocally provides that [the insurer] has the option to repair," and the insurer "chooses the option to repair, the [insured's] prevention of [the insurer's] performance excuses [the insurer's] obligation under the policy." *Hibbs*, 123 Cal. Rptr. 3d at 89 (citing Cal. Civ. Code § 1511(1)). In this case, the evidence in the record shows that Alderson refused to authorize repairs to the Van. National General has met its burden to show it is entitled to declaratory relief stating that it was excused from

performing its Policy obligations to pay for physical repairs to the Van. *See Hibbs*, 123 Cal. Rptr. 3d at 820. The burden shifts to Alderson. Alderson's evidence shows that Alderson did not permit National General to perform repairs. Alderson fails to raise a material issue of fact. National General is entitled to a judgment stating that Alderson's refusal to authorize repairs excused National General from performing its obligation to pay for repairs.

The parties have not addressed, and the Court does not reach, issues regarding excuse of performance, beyond the obligation to pay for repairs, based on a material breach by the other party. *See, e.g., Brown v. Grimes*, 120 Cal. Rptr. 3d 893, 902–03 (Ct. App. 2011) ("When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract. . . . Whether a partial breach of a contract is material depends on 'the importance or seriousness thereof and the probability of the injured party getting substantial performance.'"). The Court declines to issue a declaratory judgment regarding the parties' prospective rights and obligations under the Policy.

## VI. CONCLUSION

IT IS HEREBY ORDERED that National General's Motion for Summary Judgment (ECF No. 34) is granted in part and denied in part.

The Motion is granted as to National General's first claim for relief. National General is entitled to a judgment declaring that it properly offered to pay for the physical repairs to the Van, less the applicable deductible, and that NGIC owes no obligation to declare the Van a total loss or to pay for loss of use or diminution in value of the Van. *See* ECF No. 1 at 9.

The Motion is granted in part as to National General's second claim for relief. National General is entitled to a judgment declaring that Alderson has failed to cooperate in the adjustment of his collision claim, breaching the cooperation obligation under the Policy. The Motion is denied as to further requests for relief.

1    IT IS FURTHER ORDERED that National General shall file a proposed judgment

2  no later than February 20, 2019.  Any filings for recovery of costs shall comply with Fed.

3  R. Civ. P. 54(d) and S.D. Cal. Civ. R. 54.1.

4

5  DATED:    2/15/19

6                                          WILLIAM Q. HAYES
                                           United States District Judge